Newark Amusement Corporation v. Commissioner. Louis Handloff and Mollie Handloff v. Commissioner.
Newark Amusement Corp. v. Commissioner
Docket Nos. 67015, 67016.
United States Tax Court
T.C. Memo 1960-137; 1960 Tax Ct. Memo LEXIS 156; 19 T.C.M. (CCH) 705; T.C.M. (RIA) 60137; June 27, 1960
*156 Held, that the corporation transferred full ownership of certain improved realty to the individual petitioner, its sole stockholder, rather than mere legal title for the benefit of the corporation; such transfer was not shown to be in payment of loans owing from the corporation to the petitioner; such transfer constituted the distribution of a taxable dividend to the petitioner; the amount of the taxable dividend is limited to the accumulated earnings or profits of the corporation, plus its earnings or profits of the taxable year; in computing the earnings or profits for the taxable year the unpaid Federal income taxes for such year are not to be taken into account, the corporation being on the cash receipts and disbursements method of accounting, following Helvering v. Alworth Trust, 136 F. 2d 812, and Paulina duPont Dean, 9 T.C. 256, and distinguishing Drybrough v. Commissioner, 238 F. 2d 735; the fair market value of the property at the time received by the petitioner was at least as great as the amount of the earnings or profits of the corporation available for the payment of dividends; the dividend is in the amount of such available earnings *157 or profits; and that the petitioner is not entitled to a loss deduction on account of the demolition of the building on the property. Held, further, that the respondent did not err in disallowing deductions claimed by the corporation on account of the demolition of the building and for depreciation on the building for the period after it was transferred to the individual petitioner. Sydney A. Gutkin, Esq., 744 Broad Street, Newark, N.J., and David Beck, Esq., for the petitioners. Albert Squire, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against the petitioners as follows: Docket
Income
Petitioner
No.
Year
Tax
Newark Amusement
67015
1952
$ 1,614.59
Corporation
1953
836.45
Louis Handloff and
67016
1953
45,503.84
Mollie Handloff
The issues with respect to the corporate *159 petitioner are whether the respondent erred in disallowing for the year 1953 a demolition loss in the amount of $19,333.35 and depreciation in the amount of $250. For the year 1952 the issue is whether the petitioner is entitled to carry back a net loss from the year 1953. With respect to the individual petitioners the principal issue is whether Louis Handloff received a taxable dividend in 1953 upon the delivery to him from the corporation of a deed to certain real property, and if so the amount of such dividend. An alternative issue is whether, if Handloff did receive the property as a dividend, he is entitled to deduct a demolition loss of $19,333.35 and depreciation of $1,000. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. Newark Amusement Corporation, referred to hereinafter as the corporation, was incorporated on or about April 1, 1930, under the laws of the State of Delaware. It filed its income tax returns for the years in question on the cash receipts and disbursements method of accounting with the director of internal revenue at Wilmington, Delaware. The petitioners, Louis and Mollie Handloff, are husband and wife *160 residing in Newark, Delaware. They filed their joint return for the year in question with the same director of internal revenue. Louis will be hereinafter referred to as the petitioner. At organization the corporation took over a motion picture theatre formerly operated by the petitioner. In 1934 it acquired a piece of real estate for $16,000, which it has since held for rental purposes. The petitioner has been the sole stockholder and president of the corporation since its inception. During the years involved herein the corporation's other officers were his wife and his son, Herman. He and his wife were directors. There has never been a meeting of its board of directors or of its stockholders. Petitioner and his wife talked over matters affecting the corporation, but no minutes of such discussions were ever entered on the corporate books. The corporation's accounting records consisted of loose leaf sheets listing income and expenses on a cash receipts and disbursements method. It did not keep a double entry set of books, did not maintain a general ledger, and did not prepare balance sheets. Since 1948, its returns have been prepared by a firm of certified public accountants from *161 such records as were available, without making an audit of such records. From time to time petitioner supplied money needed by the corporation. On November 25, 1948, he delivered his personal check payable to the corporation in the amount of $6,000, and on November 30, 1948, he delivered his personal check of $2,000 payable to Keil Motor Co., for air conditioning the theatre. These amounts were never repaid by the corporation to the petitioner. On March 23, 1948, the corporation purchased property on the north side of Main Street, Newark, Delaware, known as 108 East Main Street, which is the property in question herein. The purchase price was $40,000, and there were other items of cost amounting to $24.19. The corporation gave a purchase money mortgage for $4,000, and the balance of $36,024.19 was paid by a check drawn by the petitioner on his personal account. The property had a frontage on East Main Street of 17.22 feet and a depth of about 366 feet. There was located on the property a 2 1/2 story, frame building, 28 feet X 57 feet, containing offices which the corporation held for rental purposes. The corporation reported the rental income it received each year from the property *162 and deducted the taxes and expenses it paid with respect thereto. The corporation allocated $25,000 of the purchase price to the building and took depreciation deductions on that basis. In December 1951, the petitioner approached W. T. Grant Company, hereinafter referred to as Grant, and discussed the possibility of locating one of Grant's stores on the site of the property in question. Beginning in January 1952, Grant gave serious consideration to this possibility and its representative, Harvey Hopkins, surveyed the property as well as property located at 17 Centre Street, the latter property not then being owned by either the petitioner or the corporation. This property was a rectangular plot 50 X 94 feet contiguous to and at right angles to the rear of the property at 108 East Main Street. It was so located that it would provide an outlet from the principal property to Centre Street. Hopkins negotiated with the petitioner and his son upon the basis of a lease covering both the Main Street and the Centre Street properties to be improved by a onestory building, a part of the rental to be based upon the land values of such properties. Hopkins suggested a valuation of $90,000 to *163 $100,000 and an annual rental based thereon of $4,500 to $5,000. At that time the petitioner sought a higher valuation and rental. Sometime in late 1952 Grant drafted a proposed lease and delivered it to the petitioner. The petitioner referred the lease to his nephew, Morris Cohen, an attorney who had previously represented the petitioner in various legal matters. Cohen did not actively participate in negotiations with Grant, but suggested to the petitioner or his son certain revisions in the documents. Thereafter a revised lease and lease agreement were drawn up between the petitioner as landlord, and Grant, dated November 25, 1952, but these were not executed on that date. Grant was willing to enter into the agreements at that time, but the petitioner was not. In July 1953, the petitioner, upon hearing a rumor of a proposed new shopping center to be built on East Main Street in Newark, Delaware, came to the conclusion that it was to his advantage to sign the lease. He thereupon contacted Grant and the lease and the lease agreement were signed on July 16, 1953. The lease was recorded in New Castle County, Delaware, on October 16, 1953. Both the lease and the lease agreement were *164 signed by the petitioner and his wife. The corporation did not sign these documents, nor is it mentioned therein. The lease was for a term beginning February 1, 1954 and ending on January 31, 1984, with an option in the lessee to extend the term until January 31, 1994. The lease covered all of the property at 108 East Main Street except the westerly 12 feet (and as to that the lessee was granted a right-of-way) and all of the property known as 17 Centre Street, together with building and improvements to be erected on the Main Street property by the petitioner in accordance with the lease agreement. In addition the lessee was granted the use of a certain area contiguous to 108 East Main Street, owned by the petitioner, for use as a parking lot. In the lease agreement it was provided that the petitioner should at his own expense demolish the existing improvements on the property and construct a one-story building according to fixed specifications and provide a graded and surfaced area for parking. It was provided that Grant should pay the petitioner a fixed annual rent of $4,500 until January 31, 1959, and $5,000 thereafter. The tenant was also required to pay an additional fixed *165 rent at an annual rate equal to six per cent of the cost of construction of the new building, not to exceed, however, $10,500 per year. In addition to the fixed rent, Grant was required to pay rent in an amount equal to the amount by which three per cent of gross retail sales should exceed the sum of the fixed rent and the taxes, insurance, and repairs or replacements which were to be borne by the tenant. The rent was to commence on the date that possession of the premises should be delivered to the tenant. All rental payments were to be made to the petitioner at an address, which was his residence, or to such other person and at such other address as might be designated by notice in writing from the petitioner to Grant. It was provided that the tenant should make all necessary repairs and replacements and would pay for the heat and utilities as well as all real estate taxes on the properties. In the lease agreement the petitioner as landlord warranted and represented that he was seised of an indefeasible estate in fee simple in the premises free and clear of all liens, encumbrances and restrictions. The petitioner purchased the Centre Street property on January 25, 1953, for about *166 $25,000. On September 23, 1953, the petitioner entered into a contract with a building contractor for the construction of a building in accordance with the specifications contained in the lease agreement. The petitioner is therein described as the owner of the property and the corporation is not mentioned. The petitioner then made arrangements with Newark Trust Company to borrow $150,000 to finance the construction of the building to be erected. He consulted with his nephew Morris Cohen and requested him to draw up the necessary legal papers to obtain the loan. Cohen then prepared a deed by which the corporation, for a stated consideration of $10, transferred the property located at 108 East Main Street to the petitioner. This document was signed on September 29, 1953, by the petitioner as president of the corporation. It contains the seal of the corporation attested by its secretary, Herman Handloff. Cohen prepared a construction loan agreement, which was signed by the petitioner and his wife and by Newark Trust Company on September 29, 1953, wherein the petitioner represented that he was the owner in fee of the property at 108 East Main Street. Cohen also prepared a judgment *167 bond in favor of the Newark Trust Company, which was duly signed by the petitioner and his wife on September 29, 1953, binding themselves to repay to Newark Trust Company the amount of $150,000 at expiration of six months, with interest at 5 per cent per annum. Cohen also prepared a mortgage deed which was signed by the petitioner and his wife on September 29, 1953, transferring to Newark Trust Company the property at 108 East Main Street, the Centre Street property, and certain other property. None of the above instruments was signed by the corporation nor was it indicated therein that it had any interest in the property in question. These documents had been mailed to the petitoner by Cohen. After executing them the petitioner returned the deed and the mortgage to Cohen and they were recorded at Wilmington, Delaware, on September 29, 1953. On October 6, 1953, the building contractor made application for a permit to demolish the existing building on the property at 108 East Main Street. The petitioner also signed this application, describing himself as the owner of the property. On October 5, 1953, the petitioner made application for a permit to construct the new building on the *168 premises, signing as the owner of the property. The application form contains a requirement that "If owner is a Corporate Body, two important officials sign below." The spaces for the signatures of such corporate officials are blank. The actual cost of construction of the new building was $148,125.06. Other miscellaneous expenditures chargeable to the cost of the building amounted to $12,876.87, resulting in a total cost of the building of $161,001.93. All these expenditures were paid from a personal account of the petitioner entitled "Louis Handloff, Building Account." The amount in excess of the $150,000 construction loan was paid by the petitioner from his personal funds. Construction of the new building was completed in time for Grant to commence business therein on June 17, 1954. Grant commenced paying rent beginning June 1, 1954. On September 21, 1954, the petitioner and his wife borrowed from Teachers Insurance and Annuity Association of America an amount of $150,000, executing a note in that amount on that date, providing for installment payments of principal and interest in the amount of $1,128.42 per month. The proceeds of this loan were used to pay the construction *169 loan owing to Newark Trust Company. On the same date the petitioner and his wife executed a mortgage deed in favor of Teachers Insurance and Annuity Association whereby they mortgaged to that organization the property at 108 East Main Street and the Centre Street property, together with all rents and profits therefrom. Neither the mortgage nor the note indicates that the corporation had any interest in the property in question. On September 21, 1954, the petitioner and his wife, for purposes of further securing payment to Teachers Insurance and Annuity Association, executed an assignment of all their right, title, and interest in the lease dated November 25, 1952, between the petitioner and Grant. Therein the petitioner represented and warranted that he was the owner in fee simple absolute of the premises in question, that he had good title to the lease, and that no other persons, firm, or corporation had any right, title, or interest therein. The lease was never amended and Grant never received any notice to pay the rental to any one other than the petitioner and his wife. The rents actually paid have approximated $13,500 per year. On November 17, 1954, a special bank account was *170 opened in the name of the corporation at Newark Trust Company to handle the receipts and disbursements with respect to the building occupied by Grant. Thereafter rental checks received by the petitioner were deposited to this account. The record does not show what disposition was made of rental checks received from June 1, 1954 to November 17, 1954. After the opening of the special bank account in the name of the corporation at Newark Trust Company on November 17, 1954, monthly mortgage payments to Teachers Insurance and Annuity Association were made by checks drawn by the petitioner as president of the corporation. The record does not show how payments of the monthly installments for the months of October and November 1954, were made. The corporation filed its income tax return for 1953 on March 15, 1954. Therein it claimed a loss in the amount of $19,333.35 upon the demolition of the building located at 108 East Main Street, being the difference between the portion of the original cost of the property allocated to the building, namely, $25,000, and the depreciation which had been taken thereon of $5,666.65. Therein the corporation claimed depreciation in the amount of $1,000 *171 upon this property. In the notice of deficiency the respondent disallowed the claimed demolition loss on the ground that the building in question was transferred to the petitioner prior to demolition. He disallowed $250 of the claimed depreciation on the building on the ground that depreciation was allowable to the corporation only for the period January 1 to September 29, 1953, the date on which the property was transferred to the petitioner. In its return the corporation had reported a net operating loss of $16,640.19. The respondent's disallowances of claimed deductions resulted in net income of $2,788.16. For the calendar year 1952 the corporation had reported income of $5,381.95 and had paid a tax of $1,614.59. Thereafter it made application for a carryback of a net loss from 1953 to 1952. This was originally allowed by the respondent and a refund of the $1,614.59 was made. In the notice of deficiency the respondent held that by reason of the adjustments which he made for 1953 there was no net operating loss for that year which could be carried back to 1952, and that consequently there was a deficiency for 1952. In their joint income tax return for the calendar year 1953 the *172 petitioner and his wife showed gross income from rentals in the amount of $37,410.78, net rental income of $16,069.99, total net income of $35,337.39, and a tax liability of $12,156.94. The return showed that the petitioner owned depreciable property (consisting of a theatre, some stores and some houses, together with equipment) which had an original cost of $225,593.57 on which they took depreciation for 1953 in the amount of $4,824.13. In the notice of deficiency the respondent decreased the reported net income by $10,165.70, representing a portion of the rental income reported, on the ground that such amount had been included in the tax return of the corporation. The respondent determined that the reported income should be increased by an amount of $77,000, taking the position that the conveyance by the corporation to the petitioner of the property at 108 East Main Street constituted a dividend in that amount, representing the fair market value of the property transferred. At some time in 1954, prior to December 23, an internal revenue agent who examined the returns of the corporation for the years 1952 and 1953 informed Cohen and Benjamin Stolper, the accountant for the petitioner *173 and the corporation, that in his opinion the conveyance on September 29, 1953, of the 108 East Main Street property from the corporation to the petitioner constituted a taxable dividend to the petitioner. Thereafter, at the suggestion of the accountant, Cohen prepared a deed by which the petitioner and his wife on December 23, 1954, for a recited consideration of $10, conveyed the property at 108 East Main Street to the corporation. This deed was never recorded, but at the suggestion of the accountant it was held in Cohen's file. Grant was not advised of this deed. All rent paid by Grant, commencing in June 1954, has been reported for Federal income tax purposes by the corporation as its income; the petitioner has not reported any of such rental payments as income. Facts Pertaining to Earnings or Profits of the Corporation The net income or net loss of the corporation, per stipulation, for each of the years 1930 to 1952, inclusive, was as follows: Year
Net Income
Net Loss
1930
$ 505.76
$ 434.37
1931
2,454.31
1932
510.00
1933
565.00
1934
1,557.63
1935
308.53
1936
92.76
1937
13.16
1938
38.73
1939
6.59
1940
100.18
1941
1942
88.68
1943
11,096.17
1944
9,894.70
1945
14,834.70
1946
10,162.15
1947
5,022.65
1948
9,083.18
1949
11,732.72
1950
6,034.04
1951
2,322.73
1952
5,381.95
$86,159.43
$6,081.26
*174 The total amount of Federal income taxes and additions to tax paid, per stipulation, for those years was $24,471.77, the tax for 1952 being $1,614.59. The accumulated earnings or profits of the corporation at December 31, 1952, were $57,220.99; the earnings or profits of the corporation for the year 1953 were $1,173.57; or total earnings or profits available for the payment of a taxable dividend in 1953 of $58,394.56. Additional Facts Pertaining to Value of Property The property at 108 East Main Street was located in a retail shopping area in the heart of the original business section of Newark. On September 29, 1953, the first floor of the building was occupied by the real estate department of a bank, and the second floor contained offices. From 1948 to 1953 in this area of East Main Street the buildings consisted principally of frame houses, some of which had been converted into stores by remodeling their fronts. For 1953 the property in question was assessed for local property tax purposes at $7,700 for the land and $7,775 for the building. Sales of properties on East Main Street in the vicinity of the property in question made within a reasonable time before or after *175 September 29, 1953, were as follows: "December 31, 1952, property at 250 East Main Street with frontage of 109 feet and depth of 175 feet sold (for the new shopping center) for $60,000; "May 8, 1953, property at 47-49 East Main Street with frontage of 46 feet and depth of 333 feet, improved by a frame building with two stores on the street level and four offices on the second floor, sold for $50,000; "June 29, 1953, property at 149-151 East Main Street with frontage of 59 feet and depth of 333 feet, improved with an old three story frame building (demolished by the purchaser), which had been purchased in 1939 at a cost of $8,500, was sold for $59,000; "June 30, 1953, property at 230 East Main Street with frontage of 160 feet and a depth of 850 feet sold (for new shopping center) for $105,000; "December 17, 1953, property at 51 East Main Street with frontage of 50 feet and depth of 240 feet, improved by a brick and frame building used as a store and dwelling sold for $37,500; "January 14, 1954, property at 44 East Main Street with frontage of 27 feet and depth of 195 feet, and improved by an old brick building occupied by a store and two offices, sold for $27,000; "June 30, 1954, property *176 at 132 East Main Street, with frontage of 40 feet and depth of 347 feet, improved by an old frame building with brick front containing one store and two apartments, and which had been purchased in 1937 for $6,500, sold for $37,000; and "December 1954, property at 253 East Main Street with frontage of 51 feet and depth of 196 feet, and improved by a brick dwelling and store, sold for $36,000. On September 29, 1953, the property at 108 East Main Street had a fair market value of at least $58,394.56. Opinion The principal issue in these consolidated cases is whether the individual petitioner Handloff received a taxable dividend in 1953 upon the execution by the corporation of the deed of September 29, 1953, transferring to him the property at 108 East Main Street. [1]
*177 On brief the petitioner makes several arguments to the effect that he did not receive a dividend or if so that it is not in the amount determined by the respondent. First he contends that the deed in question did not convey the real ownership in the property to him, that it was no more than a "straw" conveyance transferring mere legal title, and that equitable title remained in the corporation. We have set forth the facts in considerable detail in the Findings of Fact. Upon a consideration of the whole record, it is our conclusion that by the deed of September 29, 1953, the petitioner acquired full ownerership of the property. Commencing in 1951 the petitioner personally negotiated with W. T. Grant Company with respect to leasing the property in question to Grant. These negotiations culminated in a lease executed in July 1953, between the petitioner and his wife and Grant, requiring the petitioner to demolish the existing building and erect a new store building, and providing for the payment of rental to the petitioner. In the negotiations Grant required that certain property on Centre Street be acquired and made a part of the lease and the petitioner individually acquired that *178 property. The petitioner personally negotiated with Newark Trust Company for a construction loan of $150,000 and entered into a contract with a building contractor for the construction of the store building. On September 29, 1953, he, as president of the corporation, signed the deed conveying the Main Street property to himself. This deed was attested by his son Herman who was secretary of the corporation. Thereafter he and his wife executed a mortgage deed to Newark Trust Company covering the Main Street property, and certain other property which belonged to the petitioner. Later he obtained a permanent loan from Teachers Insurance and Annuity Association and used the proceeds to pay off the construction loan. He and his wife executed a mortgage deed to Teachers Insurance and Annuity Association covering the Main Street property and the Centre Street property. In these various documents the petitioner represented himself to be the owner of the Main Street property, and the deed of September 29, 1953, as well as the mortgage deeds were recorded. The corporation was not a party to any documents, other than the deed of September 29, 1953, and nowhere in any of such documents is it indicated *179 that the corporation retained any interest in the Main Street property. In the permits for demolition of the old building and for construction of the new store building the petitioner represented himself as being the owner. In the lease the petitioner's wife specifically gave her consent and subordinated her right, title, and interest in the premises to the rights of the tenant. The lease itself provided that the rental should be paid to the petitioner at his home address unless the lessee should be otherwise notified. No such notification was ever given by the petitioner to Grant. After the petitioner had negotiated with Newark Trust Company for the contruction loan, he engaged his nephew Cohen, an attorney, to effect such loan. Cohen contacted Newark Trust Company and then prepared a judgment bond and the mortgage deed in favor of that company covering the Main Street property. Cohen testified that when he discovered that the Main Street property was owned by the corporation he, without detailed instructions from or consultations with the petitioner, prepared the deed of September 29, 1953, transferring title to the petitioner. He stated that he did this because the Centre Street *180 property and the other property which Newark Trust Company required as security were owned by the petitioner and that it was not customary to include in one mortgage properties owned by different persons. He testified that he executed this deed as a "matter of stenographic convenience and that alone," and that no documentary stamps were placed on the conveyance because he considered it a "straw" conveyance, involving no consideration. He in effect testified that he transferred legal title to the petitioner, but that equitable title remained in the corporation. The petitioner testified that he left the matter entirely to Cohen in whom he had confidence, that he did not give any detailed instructions, and that he does not think that he reviewed any of the documents prepared for him by Cohen, but merely signed them. He stated that he never intended to transfer ownership from the corporation to himself and that when he, as president of the corporation signed the deed of September 29, 1953, he did not have any specific knowledge of what it contained. No record of either the petitioner or the corporation and no other document or memorandum was presented in evidence which would indicate *181 that the corporation retained any interest in the property, or that the petitioner in taking title was acting on behalf of the corporation in any capacity. Cohen himself testified that there were documents to this effect. Nor was there any evidence whatsoever as to any oral understanding between the petitioner and the corporation or between the petitioner and Grant, the lending agencies, or the builder, that the corporation had any interest in the Main Street property after the execution of the deed of September 29, 1953. All such other parties dealt with the petitioner upon the basis of his representations that he was the owner. Anything which Cohen might have had in mind in respect to the transfer of mere legal title to the petitioner was not communicated by him to the petitioner. It appears that the petitioner himself did not tell Cohen that he wanted mere legal title transferred to him. The petitioner's statement that he did not intend that ownership be vested in him is inconsistent with his other representations and his acts. Furthermore, if his testimony was intended to convey the impression that he did not know that the deed of September 29, 1953, transferred the property to *182 him, we cannot accept it as being true. Other testimony given by him indicates that he had talked the entire transaction over with his wife who was also a director of the corporation, and that he knew that Newark Trust Company required that the Main Street property be covered by the mortgage - indeed that it was the principal security. He must have known that the corporation itself had not mortgaged the property to the Newark Trust Company. Considering the petitioner's intelligence and his business experience, we conclude that he must have understood the steps which were being taken, particularly considering the magnitude of the over-all transaction. The petitioner makes much of the fact that on December 23, 1954, he and his wife executed a deed reconveying the property back to the corporation. It is contended that this indicates that the original intent was to transfer only legal title to petitioner. However, it is clear that this deed was prepared as an afterthought, following the disclosure by the internal revenue agent that in his opinion the transfer to the petitioner constituted a taxable dividend to him. Cohen so testified. The deed of reconveyance was not recorded, but was *183 held in Cohen's file, and the lessee was never advised of the execution of this deed. We are not here concerned with the effectiveness of such reconveyance or its tax consequences: suffice it to say that its execution does not persuade us that the deed of September 29, 1953, was other than what it purported to be, namely, a transfer of absolute ownership to the petitioner. The petitioner also lays stress upon the fact that all rent paid by Grant, commencing in June 1954, has been reported for Federal income tax purposes by the corporation, rather than by the petitioner. But here again the action in so reporting the income occurred after the dividend question arose for the year 1953 and is of little probative value here. Nor, for the same reason, do we consider it significant that all rents received from Grant and all payments in discharge of the mortgage were made through a special bank account set up on November 17, 1954, in the name of the corporation. On brief petitioner states that the objective facts are consistent with the conclusion that it was not intended to transfer ownership to him, citing as examples the fact that no meetings of the directors of the corporation were *184 held authorizing the conveyance, a settlement statement was not prepared, and documentary stamps were not affixed to the deed. In the first place the petitioner was the sole stockholder of the corporation, and it had not been its custom to conduct its affairs formally through directors' meetings. It is well established that a distribution may constitute a dividend even though not formally declared by the board of directors. Sachs v. Commissioner (C.A. 8) 277 F. 2d 879 (April 20, 1960), affirming Irving Sachs, 32 T.C. 815, and cases cited therein. The fact that no documentary stamps were placed on the deed is of no particular significance since the documentary stamp tax is imposed upon conveyances of realty sold which involves a consideration. Sections 3480 and 3482 of the Internal Revenue Code of 1939, and sections 113.80 and 113.81 of Regulations 71. On brief it is stated, without elaboration except a reference to Scott on Trusts, sections 404, 405, and 485, that there was a resulting trust or a constructive trust in favor of the corporation. We have examined the authority cited but find nothing therein which would support such a contention under circumstances *185 such as those here presented. It is our conclusion that the deed of September 29, 1953, conveyed to the petitioner absolute ownership in the property at 108 East Main Street, and that such conveyance constituted a distribution by the corporation to the petitioner. The petitioner argues that even if there was a distribution to him which is to be treated as a dividend, it does not follow that the dividend was in the full amount of the fair market value of the property. It is stated that the petitioner made loans to the corporation in an amount of at least $66,286 and that the dividend cannot exceed the excess of the value of the property distributed over the indebtedness. The alleged indebtedness to which the petitioner refers is made up of a number of items. First is the amount of $7,792.58, representing the total of net losses reported by the corporation on its income tax returns for the period 1931 to 1942, inclusive, which it is stated must have been paid by petitioner since the corporation was on the cash receipts and disbursements method of accounting. These net losses may have resulted from depreciation or other deductions which did not represent cash outlays by the corporation. *186 Hence, it may not have been necessary for the corporation to have funds advanced to it. In any event there is no evidence whatsoever to show that the petitioner did make advances in that amount. The second item referred to is $40,000, representing the amount paid in 1948 as the purchase price of the property of 108 East Main Street. The only portion of this amount which the record shows was paid by the petitioner was $36,024.19. The other items are $6,000 paid to the corporation by check dated November 25, 1948, $2,000 paid on behalf of the corporation by check dated November 30, 1948, and an amount of approximately $11,000, which petitioner personally paid for the construction of the improvements at 108 East Main Street over and above the $150,000 construction loan. Obviously this last mentioned expenditure was made after the property had been transferred to the petitioner, since construction of the improvements on the property did not commence until the property was placed in his name. The petitioner testified that at the inception of the corporation and from time to time as it became necessary he supplied funds to the corporation. At another point he stated that he loaned funds *187 to the corporation. He also referred to "advances" made. He stated that the $6,000 item was a loan to the corporation. He did not specifically so state with respect to the $2,000 item, although this might have been the purport of his testimony. He stated, however, that he had never received repayment of these amounts. There is no evidence to show that any notes were ever given for these or any other amounts or that any interest was ever paid by the corporation to the petitioner on any amounts which he supplied. Nor were any records of the corporation introduced to show that any amounts supplied by the petitioner were treated as loans. Under these circumstances we cannot conclude that any amounts which the petitioner supplied to the corporation constituted loans rather than contributions of capital to the corporation. Furthermore, even if there was any indebtedness owing from the corporation to the petitioner, there is no evidence whatsoever to show that the transfer of the property to him was intended to be or was in payment of any such indebtedness. The petitioner properly contends that in no event can it be considered that he received a taxable dividend in excess of the accumulated *188 earnings and profits of the corporation at December 31, 1952, plus earnings and profits of the corporation for the year 1953. [2] The parties have stipulated the facts from which the earnings and profits available for the payment of a taxable dividend are to be computed. However, on brief the respondent has computed this figure to be $58,394.56, whereas the petitioner contends that the amount is $53,958.11. The petitioner's computation is erroneous in that it fails to take into consideration stipulations as to excessive depreciation taken by the corporation in each of the years 1942 and 1946 in the amount of $1,800. The other item of difference between the computations of the petitioner and the respondent relates to the earnings or profits for the year 1953. The parties stipulated that if this Court should determine that the demolition loss of $19,333.35 deducted by the corporation on its return for 1953 is not an allowable deduction "then its earnings and profits for the year 1953 were $2,788.16." It is clear, and we hold, that whether or not the corporation might otherwise have been entitled to deduct a demolition loss, the fact that the property at 108 East Main Street was transferred *189 by the corporation to the petitioner prior to the demolition of the building thereon would preclude the allowance of a demolition loss by the corporation. Despite the fact that the amount of $2,788.16 was stipulated to be the "earnings and *190 profits" for the year 1953, the petitioner argues on brief that this amount should be decreased by the tax at 30 per cent on that amount, or $836.45. A reference to the notice of deficiency shows that the amount of $2,788.16 is the net income of the corporation for 1953 as determined by the respondent, and that the amount of $836.45 is the deficiency which the respondent determined, which determinations we approve herein. The corporation, being on the cash receipts and disbursements method of accounting, did not pay this tax in 1953, and indeed it does not appear that it has yet been paid. The petitioner cites no authority in support of his position. The respondent on brief does not contend that the stipulation precludes consideration of the question raised by the petitioner, but takes the position that the earnings and profits should not be reduced since the corporation was on the cash receipts and disbursements method of accounting, citing section 39.115(a)-2 of Regulations 118; [3]Helvering v. Alworth Trust (C.A. 8), 136 F. 2d 812, certiorari denied 320 U.S. 784, reversing 46 B.T.A. 1045; and Paulina duPont Dean, 9 T.C. 256, appeal *191 dismissed (C.A. 3), January 26, 1949. He argues that Drybrough v. Commissioner (C.A. 6), 238 F. 2d 735, which reversed United Mercantile Agencies, Inc., 23 T.C. 1105, is distinguishable.
*192 The quoted regulations have been in existence since 1941. The Supreme Court has often stated that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. Commissioner v. South Texas Lumber Co., 333 U.S. 496, (a case which, incidentally, approved another provision of the same section of the regulations here involved). After the decision in Alworth Trust, supra, this Court has followed that decision and has held that unpaid Federal income taxes are not to be taken into account in determining the earnings or profits of a corporation on a cash basis. Paulina duPont Dean, supra.We have carefully considered Drybrough v. Commissioner, supra, but we are of the opinion that that case does not affect the general principles applicable in the ordinary case such as the instant case. There the two taxpayers who owned and controlled the corporation diverted to themselves income of the corporation which would have been subject *193 to a 95 per cent excess profits tax had this income been reported by the corporation. Later, when the respondent proceeded against the corporation, they returned these amounts to the corporation in full, but the deficiencies and penalties assessed against the corporation more than exhausted those funds and the claim was made that the corporation was thereby rendered insolvent. The court did not specifically disagree with the decision in Helvering v. Alworth Trust, supra, but stated: "* * * The practical issue presented to the Court of Appeals in the Alworth case, however, was whether corporate tax liability should reduce earnings and profits in 1937 or 1938. Here, by contrast, the practical issue is whether a corporation's earnings and profits can ever be effectively adjusted by taxes owed and subsequently paid, in order to prevent a distribution of capital from being taxed as ordinary income. * * *
"In the present case the petitioners knew that the corporation was properly chargeable with a ninety-five per cent excess profits tax on the funds which they were diverting. They subsequently had to pay the money back to the corporation to enable it to meet its tax *194 obligations. Both common sense and realism require the conclusion that the corporate taxes attributable to the diverted income should be excluded from the corporation's earnings and profits under the circumstances of this case. * * * We further conclude that the fraud penalties for which the corporation has been found liable should be deducted from earnings and profits for the respective years in which the fraudulent returns were filed. * * *" It is our conclusion that in the instant case the unpaid deficiency of $836.45 for the year 1953 should not be used to reduce the earnings or profits of the corporation for that year. However, the tax of $1,614.59 for the year 1952 does reduce the earnings or profits for the year 1953, the year in which paid. We have accordingly found that the accumulated earnings or profits of the corporation at December 31, 1952, were $57,220.99, that the earnings or profits for the year 1953 were $1,173.57, or a total of earnings or profits available for the payment of a taxable dividend in 1953 of $58,394.56. The property in question was purchased by the corporation in 1948 for $40,000. The respondent determined that it had a fair market value of $77,000 *195 on September 29, 1953. On brief the petitioner contends that the fair market value did not exceed $28,333.33. Considerable evidence was adduced as to the fair market value of the property as of that date. This consisted of evidence of sales of other properties, appraisals made, and opinion testimony. We have set forth in the Findings of Fact the details of the sales which occurred in the vicinity within a reasonable time before and after September 29, 1953. These show that some properties in the neighborhood sold for as much as $1,000 per front foot. In general the properties were similar to the property in question, and although the depths of the lots varied, this apparently was not a substantial factor in determining value. We also note that in January 1953, the petitioner purchased the property at 17 Centre Street, which adjoined the property in question at the rear, for $25,000. This property had a frontage of 50 feet on Centre Street, which was a side street, whereas the property in question had a frontage of 77 feet on Main Street. The petitioner's witness, John P. Dolman, a real estate broker and appraiser who had made an examination of the property just prior to the trial *196 in this case, but who had previously, in 1953 or 1954, acquired some knowledge of property values in Newark, testified that in his opinion the land at 108 East Main Street, taking into account the lease agreement calling for the erection of the new building, had a value at September 29, 1953, of $50,000. The petitioner testified that in his opinion the property in question had not increased in value until the new shopping center was started. The record does not show precisely when the new shopping center was commenced, but it does show that as early as December 1952, property was being purchased for that project. Herman Handloff, the petitioner's son, who is a member of the real estate appraisal committee of a local bank, testified that in his opinion the land in question was worth about $20,000 in September 1953, and that the improvements prior to demolition had a value of about $25,000. Robert E. Hickman, a witness for the respondent, who was a licensed real estate broker, testified that on July 21, 1953, he submitted to Teachers Insurance and Annuity Association an appraisal of the property projected to the time of completion of the new building. In such appraisal he estimated *197 that the property would have a fair market value at the date of occupancy of $278,000 of which $108,000 represented the value of the land at 108 East Main Street and 17 Centre Street, no value being assigned to the old building which was to be demolished. The respondent's other witness, Harvey Hopkins, who was employed as a real estate negotiator by Grant in 1953, testified that he made surveys of the property in that year, that it appeared to him at that time that the property was the best available site in Newark for a Grant store, and that the value of the land, including the Centre Street land, would be at least $90,000, computed by the capitalization of the fixed rental at 5 per cent. In this connection the evidence shows that when Hopkins and the petitioner negotiated in 1952 for the rental to be paid by Grant, they did so on the basis of a value of $90,000 to $100,000 for the Main Street and Centre Street land, without regard to the improvements. Based upon a consideration of all the evidence presented, we are satisfied that the property at 108 East Main Street had a fair market value on September 29, 1953, of at least $58,394.56, and we have so found as a fact. It is held, *198 therefore, that the transfer of the property to the petitioner on that date constituted the payment of a taxable dividend to him in the amount of $58,394.56. The petitioner contends in the alternative that he should be allowed a deduction for depreciation on the building for the year 1953 in the amount of $1,000. This was the amount which had been claimed by the corporation as depreciation on the old building for the full year 1953, of which the respondent allowed $750 as a deduction by the corporation. We fail to see any ground for holding that the petitioner is entitled to deduct any depreciation on account of this property. Irrespective of the question of basis of the building in the hands of the petitioner, the fact that the petitioner did not hold the property for any substantial time after its acquisition, but rather demolished it immediately (on brief petitioner states that demolition commenced on October 1953) would preclude the deduction of any amount on account of depreciation of the building. The petitioner also makes the alternative contention that he is entitled to a demolition loss in the amount of $19,333.35, this being the difference between the portion of the original *199 cost of the property to the corporation which had been allocated to the building, namely, $25,000, and the amount of depreciation which the corporation had deducted, $5,666.65. Here again, wholly aside from the question of the proper basis of the building in the hands of the petitioner, no deduction is allowable. It is well established that if a taxpayer purchases real estate improved with a building, which at the time he buys it he intends to demolish, or where the building is demolished for the purpose of making way for the erection of a new structure, or demolition is required as a condition to the acquisition of a valuable lease, the taxpayer is not entitled to deduct the basis of the building. Liberty Baking Co. v. Heiner (C.A. 3), 37 F. 2d 703; Commissioner v. Appleby's Estate (C.A. 2), 123 F. 2d 700, affirming 41 B.T.A. 18; Blumenfeld Enterprises, Inc., 23 T.C. 665, affirmed per curiam (C.A. 9) 232 F. 2d 396; Estate of Clara Nickoll, 32 T.C. 1346, on appeal (C.A. 7). As stated in Commissioner v. Appleby's Estate, supra: "* * * Losses are recognized only when they result from a closed *200 transaction. If a building is demolished because unsuitable for further use, the transaction with respect to the building is closed and the taxpayer may take his loss; but if the purpose of demolition is to make way for the erection of a new structure, the result is merely to substitute a more valuable asset for the less valuable and the loss from demolition may reasonably be considered as part of the cost of the new asset and to be depreciated during its life. * * *" The question of the deductibility of a demolition loss has usually arisen in cases where there has been a purchase by the taxpayer, whereas here the petitioner received the property as a dividend. However, this does not affect the basic question here involved. In Commissioner v. Appleby's Estate, supra, the property in question had been acquired by inheritance. We hold that the petitioner is not entitled to a deduction in 1953 on account of the demolition of the building at 108 East Main Street. We have held hereinabove that the corporation is not entitled to deduct a demolition loss as claimed. We also approve the respondent's disallowance of depreciation claimed by the corporation on the old building *201 at 108 East Main Street for that portion of 1953 after the property was transferred to the petitioner. It follows that the corporation had no net operating loss for the year 1953 for the purpose of a carryback to the year 1952. Decisions will be entered under Rule 50. Footnotes
1. Section 115 of the Internal Revenue Code of 1939 provides: (a) Definition of Dividend. - The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * * (b) Source of Distributions. - For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *
(j) Valuation of Dividend. - If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder.↩
2. Section 115(n) of the Internal Revenue Code of 1939, as added by section 3 of Public Law 629, 84th Cong., 2d Sess. (53 Stat. 46) provides in part: (n) Certain Distributions in Kind. - (1) Notwithstanding any other provision of this section, a distribution of property by a corporation to its stockholders, with respect to its stock, shall be * * * considered to be a distribution which is not a dividend (whether or not otherwise a dividend) to the extent that the fair market value of such property exceeds the earnings and profits of such corporation accumulated after February 28, 1913, and the earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions, except those described in subparagraphs (A), (B), and (C), of paragraph (3), made during the taxable year) without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩
3. Section 39.115(a)-2 of Regulations 118 provides in part as follows.. Earnings or profits. (a) In determining the amount of earnings or profits (whether of the taxable year, or accumulated since February 28, 1913, or accumulated before March 1, 1913) due consideration must be given to the facts, and, while mere bookkeeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings or profits in any case will be dependent upon the method of accounting properly employed in computing net income. For instance, a corporation keeping its books and filing its income tax returns under sections 41, 42, and 43 on the cash receipts and disbursements basis may not use the accrual basis in determining earnings and profits * * *. The above provision was first incorporated in section 19.115-3 of Regulations 103 (under the Internal Revenue Code of 1939) by T.D. 5059 (July 8, 1941), 1941-2 C.B. 125↩, and the same language continued in section 29.115-3 of Regulations 111.